## Case No. 17,814.

### WILSON v. JORDAN et al.

[3 Woods, 642.] [2]

Circuit Court, N. D. Alabama.   April Term, 1878.

FRAUDULENT CONVEYANCES—DEED BY INSOLVENT TO WIFE—EXECUTORS—BREACH OF TRUST—CONTRACT WITH CONTESTANT OF WILL.

1. J. who was insolvent, conveyed to his wife real and personal property of the value of $7,700, for a consideration estimated at $1,537. *Held*, that the consideration was so grossly inadequate as, under the circumstances, to establish conclusively the fraudulent character of the conveyance.

[Cited in Dodson v. Cooper, 50 Kan. 681, 32 Pac. 371.]

2. A testator devised a large estate to various legatees to the exclusion of the heir. The heir filed a bill, in which the validity of the will was assailed. Pending this bill, the executor and the heir entered into a contract with each other, to the effect that, in case the will should be set aside, the executor was to pay the heir a certain fixed sum out of the estate and retain as his own all the residue, to the exclusion of the legatees under the will. *Held*, that such a contract was a flagrant breach of trust by the executor, and was against public policy and void.

In equity. Heard upon pleadings and evidence for final decree. The bill was filed by the complainant [Robert H. Wilson] as assignee in bankruptcy of Fleming Jordan, to set aside as fraudulent two deeds made by Jordan on September 29, 1866, one to his wife, Lucy Jordan, and the other to Frederick B. Moore. Both these deeds conveyed personal as well as real property. They were attacked by the complainant on the ground that the consideration for the conveyances was grossly inadequate, and that they were executed to hinder, delay and defraud the creditors of Jordan. The consideration of the deed to Lucy Jordan was the release of her inchoate right of dower in the lands conveyed by her husband to Moore, and the consideration of the conveyance to Moore was the cancellation of a debt due to Moore from

Jordan, evidenced by certain bills of exchange of which Jordan was the drawer, and Moore the holder, amounting to $28,000.

S. D. Cabiniss, F. P. Ward, and David P. Lewis, for complainant.

L. P. Walker, D. D. Shelby, Milton Humes, and Geo. S. Gordon, for defendants.

WOODS, Circuit Judge. The evidence shows conclusively, indeed it is not controverted, that on September 29, 1866, the day when the deeds to Frederick B. Moore and Lucy Jordan were executed, Fleming Jordan was largely insolvent. At that time he owed at least $80,000, and all his property was not worth more than $25,000 or $26,000. On the day just mentioned he conveyed, substantially, all his real and personal property to Frederick B. Moore, and to his wife, Lucy Jordan, and others. Lucy Jordan knew that her husband was insolvent at the date of the conveyance to her, for she so testifies. The real estate conveyed to her by the deed in question is estimated by one witness, Joseph C. Bradley, at $5,000, by another witness, Larkin A. Warthan, at $9,550, and it was valued for taxation for the year 1867, by Lucy Jordan herself, at $9,000, and taxes paid by her on that valuation. Two items of the personal property conveyed by said deed, namely, six mules and two hundred barrels of corn, are estimated by the witness Warthan to be worth $2,020, the mules $1,020, and the corn $1,000. Besides these articles of personal property, the deed to Lucy Jordan also conveyed to her one wagon and gear, fifteen head of cattle, twenty head of hogs, one horse-cart, one rockaway and harness, and all the household and kitchen furniture at the residence of the grantor. Lucy Jordan, in her evidence, puts the value of the mules at $900, and other witnesses put the price of corn at from sixty to seventy-five cents per bushel. According to the lowest estimates made by the witnesses, the mules and corn alone were worth $1,500.

The return of property for 1867 made by Lucy Jordan for taxation, shows that she returned for taxation cattle over five head in number, valued at $150, household and kitchen furniture in excess of $300, valued at $700, and vehicles, not excluding those used for agricultural purposes, valued at $50. The value of these articles amounted, in the aggregate, to $1,200. It is true, it is not directly shown that they were the same articles conveyed by the deed of Fleming Jordan the year before, but the inference that they are so is not a forced one. If this property, returned by Lucy Jordan for taxation in 1867, was not the property conveyed to her by Fleming Jordan in 1866, it certainly stood her in hand to show it. It was a fact peculiarly within the knowledge of herself and husband, yet neither of them has attempted to deny the identity of the property. Estimating the corn and mules at $1,500, and the other personal property conveyed at $1,200, the esti-

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

mate put upon it by Lucy Jordan for taxation, the value of the personal property conveyed by the deed of September 29, 1866, foots up at $2,700. Estimating the mules and corn at the price named by Warthan, to wit, $2,020, the entire value of the personal property conveyed foots up $3,220. There are but two estimates of the value of the real estate conveyed to Moore, in which Lucy Jordan released her dower. One is that of Warthan, who placed it at $10,500, and the other of Joseph C. Bradley, who placed it at $7,000. The only evidence to show the residue of the lands conveyed by Fleming Jordan to Warthan, Lightfoot, Reynolds and Larkins, was the sum for which Jordan testifies he sold them at that time. These lands sold for $2,225. Therefore, taking Warthan's estimate, the entire value of the lands in which Mrs. Jordan released her dower, as a consideration of the conveyance to her, was $12,750; according to Bradley's estimate, was $9,225.

Now, what was the inchoate right of dower of Lucy Jordan, in other lands, worth on September 29, 1866. The statute of Alabama has fixed the utmost limit to its value. If, at the date just named, Mrs. Jordan had actually been a widow eighteen years of age and in perfect health, the present value of her vested dower estate in these lands would have been, according to the law of Alabama, only one-sixth of their value, in fee simple. See Walk. Rev. Code, §§ 2229–2231. Accordingly, therefore, to Warthan's estimate of the value of the lands, Mrs. Jordan's dower therein, if she had been a widow in youth and health, would have been $2,125; according to Bradley's, it would have been $1,537. When it is remembered that on September 29, 1866, the date of her release of dower, Mrs. Jordan's husband was living, that he was only five years her senior, and that she was fifty-seven years of age, the value of her inchoate right of dower almost entirely disappears. But suppose it to be worth what it would have been if she had been actually a widow eighteen years of age, and in good health, how does its value compare with what she received for it? According to the highest estimate of the value of her dower, and the lowest estimate of the value of the personal property only, conveyed to her by the deed of September 29, 1866, she received in personal property alone $575 more than her dower was worth. Taking Bradley's estimate of the lands in which dower was released, the mules and corn alone, at the lowest estimate put upon them by any witness, came within $37 of paying all that her dower was worth, if she had been actually a widow and only eighteen years old. The truth is, that the inchoate right of dower of Mrs. Jordan, in the lands conveyed by her husband, was almost worthless. If we are to exercise our own judgment in such matters, we know that, if put up to sale, it would have brought nothing. The purchasers of the land would doubtless

have paid a small sum for it, but not near one-sixth of the value of the estate in fee.

These facts show how grossly inadequate was the consideration paid by Mrs. Jordan for personal property worth from $2,000 to $3,000, and for lands estimated at from $5,000 to $9,550. When we reflect that at the time of this transaction Jordan owed more than three times what he had means to pay, and that he knew, and his wife knew, that he was insolvent, and that he, on the day he made the conveyance to his wife, conveyed everything else he owned in the world to his brother-in-law, Moore, it needs no further consideration to establish the fraudulent nature of the deed to Mrs. Jordan. So gross an inadequacy of consideration, taken in connection with the insolvency of Jordan, is alone sufficient to show the fraud of the conveyance. Kempner v. Churchill, 8 Wall. [75 U. S.] 362; Ratcliff v. Trimble, 12 B. Mon. 32; Borland v. Mayo, 8 Ala. 104; Prosser v. Henderson, 11 Ala. 484. The release of her dower was more than thrice paid for by the personal property which she received, and the conveyance of the land to her was left without any consideration whatever. Taking any of the estimates of the value of the property, the consideration which Mrs. Jordan received for the release of her dower, was nearly equal in value to the entire estate in fee in which she released her dower. We think the facts clearly show that the difference between the property conveyed to her and the consideration paid "was so great as to shock the common sense of mankind, and furnish in itself conclusive evidence of fraud." Hoot v. Sorrell, 11 Ala. 400.

I have thus far considered the case as if Fleming Jordan had such title in the lands conveyed to Moore as gave his wife a right of dower therein in case she survived him. But that Fleming Jordan had such title is strenuously denied by the complainant. To entitle Mrs. Jordan to dower, her husband must have held the legal title during coverture, or must have had a perfect equity therein. Walk. Rev. Code, § 1624. Jordan had no legal title. On his own showing he had only a contract for a deed. Had he such an equity as entitled his wife to dower?

The facts about this contract, as claimed by the complainant in this case, were these: Fleming Jordan was one of the executors of the will of Fleming J. McCartney, deceased. Mathew H. Bone and wife, the latter being the only heir of McCartney, having filed their bill against Jordan, as executor, and others as legatees under the said will, Jordan entered into a contract, by which it was agreed between him and Bone and wife, that in the event the will should be set aside and the probate revoked, Bone and wife were to take $40,000 of the estate, and sufficient in addition to pay off certain sums in which they were indebted, amounting to between $2,000 and $3,000, and that Jordan was to have the residue of the estate to pay off its

debts and to distribute among the legatees under the will. Jordan, on the other hand, claimed that the contract he made was for his own benefit exclusively, and that he, individually, was to have and retain all the residue of the estate remaining after the share of Bone and wife was taken out and the debts of the testator were paid. This would leave in his hands a residuum of about $60,000.

In the view I take of this branch of the case, it is unnecessary to pass upon this disputed question of fact. Taking Jordan's own version of the contract between himself and Bone and wife, can such a contract be sustained? Fleming J. McCartney, the testator, reposing confidence in the fidelity and integrity of Jordan, had made him one of the executors of his will, to take the title to and distribute his estate among the legatees under his will. While holding this trust his title as executor was attacked by a stranger to the will. Pending this attack, and while the suit was undetermined, Jordan, according to his own showing, entered into an understanding with the party assailing his title, by which it was agreed that if the title were declared void, they would divide the property of the testator between them, Jordan taking the lion's share, to the exclusion of all the beneficiaries under the will. Now, if Jordan made this contract, he was guilty of a most flagrant betrayal of his trust. His contract was in violation of the clearest dictates of public policy.

"No party can be permitted to purchase an interest in property and hold it for his own benefit, when he has a duty to perform in relation to such property which is inconsistent with the character of a purchaser on his own account and for his individual use." Van Epps v. Van Epps, 9 Paige, 237; Hawley v. Cramer, 4 Cow. 717. Much less can an executor whose duty it is to defend his title to the trust property, make a contract with the party assailing the title, by which, in case the assault prevails, the property of the estate is to be divided between them. When such a contract is made and carried into execution, the executor will be declared a trustee for the legatees under the will. "Where trust and confidence are reposed by one party in another, and such other accepts the confidence and trust, equity will convert him into a trustee, whenever it is necessary to protect the interest of the confiding and do justice between them." Tiff. & B. Trusts, 481.

It is a rule in equity, of universal application, that no person can be permitted to purchase an interest in property, where he has a duty to perform which is inconsistent with the character of purchaser. The rule is applicable to all classes of persons standing in fiduciary relations, or relations of confidence. As stated by the supreme court of the United States, in Michoud v. Girod, 4 How. [45 U. S.] 503, "the general rule stands upon our

great moral obligation, to refrain from placing ourselves in relations which, ordinarily, excite a conflict between self-interest and integrity." And, if an agent employed to purchase for another, purchases for himself, he will be considered trustee of his employer. Story, Eq. Jur. 316. So, if an agent discover a defect in the title of his principal to land, he cannot misuse the discovery to acquire the title for himself; if he do, he will be held a trustee for his principal. Ringo v. Binns, 10 Pet. [35 U. S.] 269. So, also, where an individual is employed as an agent to purchase up a debt of his employer; he is bound to purchase it at as low a rate as possible; if, therefore he purchase it upon his own account, he will be deemed as acting for his principal, and will be entitled to no more than he paid for it. Reed v. Norris, 2 Mylne & C. 361, 374; Hitchcock v. Watson, 18 Ill. 289; Moore v. Moore, 5 N. Y. 256. Where a trustee, after the acceptance of the trust, causes a sale of part of the trust property under execution, for his own benefit, and becomes himself the purchaser, he will be considered as having purchased in his character of trustee for the benefit of those concerned in the trust. Harrison v. Mock, 10 Ala. 185. Where an executor has, under a decree of foreclosure of a mortgage due to the estate, purchased the premises, he holds in trust; if he sells the premises at a large advance, such excess will belong to those for whose benefit the mortgage was held. Martin v. Branch Bank, Decatur, 31 Ala. 115.

It is impossible to enumerate all the cases where the law raises an implied trust between parties standing in a confidential relation to each other. The law is very astute in discovering such relation, and exact in requiring fidelity to it. Reasoning from the foregoing authorities, can a clearer case for the application of the doctrine of implied trusts be found than the case under consideration? I think not. So, whether Jordan made the understanding with Bone and wife, for the benefit of all the legatees under the will of McCartney, as they claim, or for his own exclusive benefit, as he claims, is immaterial. In either case, he is a trustee for the benefit of the legatees under the will. There has been no such acquiescence in his claim by the legatees as estops them from settling up the trust, for the evidence shows a decree in their favor against Jordan, rendered by the state chancery court, establishing the trust. If Jordan held the lands conveyed to Moore in trust for the legatees under the will of McCartney, as it seems to me clear he did, his wife had no contingent right of dower therein. And the only consideration for the conveyance made to her by her husband on September 29, 1866, was her inchoate right of dower in other lands, the fee of which sold for $2,225. Under the most favorable circumstances for the dowress, the present value of dower in these lands, ac-

cording to the rule laid down by the Code of Alabama, would only be $370. When it is remembered that in this case the husband was living, and his wife was fifty-seven years of age at the date of her release of dower, the value of that release shrinks to an almost inappreciable sum. I am therefore led to the conclusion that Jordan, being hopelessly insolvent, and knowing it, and his wife knowing it, his conveyance to her of property valued at from $8,000 to $12,000 for so grossly inadequate a consideration, establishes, conclusively, the fraudulent character of the transaction, and that the conveyance is null and void. This conclusion is strengthened by the fact that, on the same day, Jordan made a conveyance to a near relative of substantially all his remaining property and effects.

It only remains to consider whether the conveyance of the personal property included in the deed from Jordan to Moore was fraudulent and void. After a patient consideration of the evidence upon this point, I am not satisfied that the fraud in this conveyance has been made out. The consideration was certainly ample. By the conveyance of a tract of land to which he had no title, either legal or equitable, and a small lot of personal property worth $1,500 or $2,000, Jordan pays off bills of exchange of which he was the drawer, amounting to $28,000, and for which his vendee had paid $4,500 in money. The title of Jordan to the land must have been considered doubtful, for he had twice offered it in payment of the bills, and his offer had been declined. By the purchase of the land, Moore became the creditor of Jordan to the amount of $28,000, and Jordan had the right, in September, 1866, to make the conveyance to him in payment of the debt, even though such conveyance resulted in a preference of Moore to the exclusion of all other creditors. It is true there are some circumstances of suspicion surrounding the conveyance, which I will not notice; suffice it to say, that they do not establish satisfactorily the fraud of the conveyance. There must be a decree dismissing the bill as to Moore, and declaring the deed of Jordan to his wife to be fraudulent and void, and directing the property to be turned over to the complainant as assets of the bankrupt estate of Jordan, and to be administered accordingly.